# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

January 28, 2014

No. 11-60458

Lyle W. Cayce
Clerk

FAITH JAMES,

Plaintiff - Appellant,

v.

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,

Defendant - Appellee.

Appeals from the United States District Court
for the Southern District of Mississippi

Before STEWART, Chief Judge, and GARZA and ELROD, Circuit Judges.

CARL E. STEWART, Chief Judge:

IT IS ORDERED that the opinion previously filed in this case, *James v. State Farm Mut. Auto. Ins. Co.*, No. 11-60458, 719 F.3d 447 (5th Cir. June 21, 2013), is WITHDRAWN. The following opinion is substituted therefor:

Defendant-Appellee State Farm Mutual Automobile Insurance Co. ("State Farm") tendered the policy limit on its uninsured motor vehicle coverage to Plaintiff-Appellant Faith James nearly thirty months after James was injured in a car accident. James brought a bad faith claim under Mississippi law, and the district court granted State Farm's motion for summary judgment. For the following reasons, we AFFIRM in part, REVERSE in part, and REMAND.

No. 11-60458

## I. BACKGROUND

### A. Facts

On February 3, 2006, James was involved in a car accident with Jarvis Smith. The parties do not dispute that Smith's negligence was the sole cause of the accident. James's vehicle turned over at least once, and she was taken from the scene in an ambulance to Wayne General Hospital. James received numerous stitches for a head wound and testified in her deposition that she felt significant pain in her chest, back, and head immediately after the accident.

At the time of the accident, James and/or her husband owned four State Farm insurance policies. The policy on the vehicle James was driving at the time of the accident included $5,000 in medical payments coverage, collision coverage, and $10,000 per person in uninsured/underinsured motor vehicle ("UM") coverage. Each of the other three policies also provided $10,000 per person UM coverage for a stacked total of $40,000 in UM benefits. The parties do not dispute that James's policies were in effect at the time of the accident. After James promptly notified State Farm of the accident, State Farm quickly paid out under its medical payments and collision coverage.

At issue is State Farm's delay in paying James benefits under her UM coverage. As the timeline of events contained in the record underpins our analysis of James's claims, we refrain from a lengthy factual recitation here and instead present critical events in our below discussion. We now continue our summary of this case's background with an overview of its procedural history.

### B. Procedural History

On October 23, 2007, James and her husband[1] filed a complaint against State Farm in federal district court on diversity grounds. On February 13, 2008, James filed an amended complaint, which alleged that State Farm was

---

[1] James's husband later voluntarily dismissed his complaint.

No. 11-60458

intentionally engaging in delaying tactics to avoid paying on the policies. Because of this delay, the complaint alleged that State Farm had, *inter alia*, committed the tort of bad faith.[2]  The complaint requested a jury trial and sought $40,000 due under the policy, compensatory damages, and punitive damages.

Over the next several months, the magistrate judge granted two motions to compel against State Farm.  On July 29, 2008, State Farm paid its stacked UM policy limit of $40,000 to James.  State Farm then filed a motion for summary judgment on October 29, 2008.  On May 6, 2011, the district court granted State Farm's motion for summary judgment, entered final judgment in favor of State Farm, and dismissed the complaint with prejudice.  No. 4:07-CV-137, 2011 WL 1743421 (S.D. Miss. May 6, 2011).  This appeal followed.[3]

## II.  DISCUSSION

On appeal, James makes two arguments related to her bad faith claim: (1) State Farm withheld payment under one policy in order to coerce a lower settlement for claims under other policies, and (2) State Farm unreasonably delayed payment on the claim without a legitimate or arguable basis for doing so.

---

[2] James also asserted that State Farm's actions were "a breach of Defendant's duties of good faith and fair dealings and duty to fairly and promptly adjust claims under the Plaintiffs' policy."  Even if the pleadings indicate James may have asserted these as claims separate from her bad faith claim, James has pressed only her bad faith claim on appeal.

[3] On appeal, James appears to assert a separate breach of contract claim.  The district court apparently interpreted this claim as a sub-issue within James's bad faith claim. On appeal, James combines this claim with her argument as to the independent tort of bad faith. Assuming *arguendo* that James intended to assert a breach of contract claim separate from her bad faith claim, we hold this claim to have been waived on appeal because James points to no policy provisions supporting this claim.  *See* Fed. R. App. P. 28.  Accordingly, we affirm the district court to the extent that it granted summary judgment to State Farm on a breach of contract claim independent of James's bad faith claim.

## A.  Standard of Review

We review a district court's grant of summary judgment de novo. *Bradley v. Allstate Ins. Co.*, 620 F.3d 509, 516 (5th Cir. 2010) (citation omitted). Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A genuine dispute about a material fact exists when the evidence presented on summary judgment is such that a reasonable jury could find in favor of the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  We view all facts and evidence in the light most favorable to the non-movant, here James.  *Bradley*, 620 F.3d at 516 (citation omitted).  When a defendant moves for summary judgment and identifies a lack of evidence to support the plaintiff's claim on an issue for which the plaintiff would bear the burden of proof at trial, then the defendant is entitled to summary judgment unless the plaintiff is able to produce "summary judgment evidence sufficient to sustain a finding in plaintiff's favor on that issue." *Kovacic v. Villarreal*, 628 F.3d 209, 212 (5th Cir. 2010) (citations omitted) (quoting *Thompson v. Upshur Cnty, Tex.*, 245 F.3d 447, 456 (5th Cir. 2001).  "[T]he propriety of summary judgment [is] bound up in the burdens of proof at trial . . . ." Steven Alan Childress & Martha S. Davis, 1 *Federal Standards of Review* § 5.02, at 5-26 (4th ed. 2010) (citing *Anderson*, 447 U.S. at 247–48, 254).

We review the district court's interpretation of state law de novo, and we "give no deference to its determinations of state law issues." *Bradley*, 620 F.3d at 516 (citation omitted).

## B.  Applicable Law

Because James brought this case in federal court on diversity grounds, Mississippi substantive law applies.  *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938). "To determine issues of state law, we look to final decisions of the state's

No. 11-60458

highest court, and when there is no ruling by that court, then we have the duty to determine as best we can what the state's highest court would decide." *Westlake Petrochems., LLC v. United Polychem, Inc.*, 688 F.3d 232, 238 n.5 (5th Cir. 2012) (citation omitted). "In making an [*Erie*] guess in the absence of a ruling from the state's highest court, this Court may look to the decisions of intermediate appellate state courts for guidance." *Howe ex rel. Howe v. Scottsdale Ins. Co.*, 204 F.3d 624, 627 (5th Cir. 2000) (citation omitted).

### 1. *Claim against insurer for bad faith*

James asserts that State Farm committed the tort of bad faith when it delayed payment on her UM claim. "[A] bad faith refusal claim is an 'independent tort' separable in both law and fact from the contract claim asserted by an insured under the terms of the policy." *Spansel v. State Farm Fire & Cas. Co.*, 683 F. Supp. 2d 444, 447 (S.D. Miss. 2010) (alteration in original) (quoting *Hartford Underwriters Ins. Co. v. Williams*, 936 So. 2d 888, 895 (Miss. 2006)).

The Mississippi Supreme Court has recognized that claimants can bring bad faith claims against and recover punitive damages from insurers who refuse to pay out on a valid claim. *See Caldwell v. Alfa Ins. Co.*, 686 So. 2d 1092, 1098 (Miss. 1996) (holding that denial of a valid insurance claim is critical for the submission of punitive damages to a jury). Additionally, although Mississippi courts are skeptical of such claims, they have permitted claimants to recover damages on bad faith claims when resolution of an insurance claim is merely delayed rather than ultimately denied.[4] *See, e.g., Travelers Indem. Co. v. Wetherbee*, 368 So. 2d 829, 834–35 (Miss. 1979) (affirming jury award for punitive damages where insurer withheld payment for eight months); *AmFed*

---

[4] Thus, here, we treat caselaw that refers to a "denial of a claim" as interchangeable with a "delay of payment on a claim" unless the context indicates that the law pertains specifically to a denial.

No. 11-60458

*Cos., LLC v. Jordan*, 34 So. 3d 1177, 1191 (Miss. Ct. App. 2009) (affirming trial judge's decision to submit punitive damages issue to the jury in a delay-of-payment case); *Pilate v. Am. Federated Ins. Co.*, 865 So. 2d 387, 400 (Miss. Ct. App. 2004) ("[T]here may be cases where a delay [of payment for one month] could possibly be sufficient grounds for a bad faith claim."); *see also Essinger v. Liberty Mut. Fire Ins. Co.*, 529 F.3d 264, 271 n.1 (5th Cir. 2008) (citation omitted) ("Inordinate delays in processing claims and a failure to make a meaningful investigation have combined to create a jury question on bad faith."); *but see Tutor v. Ranger Ins. Co.*, 804 F.2d 1395, 1399 (5th Cir. 1986) (per curiam) (reversing jury's punitive damage award where payment was delayed during an ongoing dispute between insured and insurer); *Caldwell*, 686 So. 2d at 1098 (affirming grant of summary judgment where insurance company delayed payment for three months in complex wrongful death claim, including a six-week delay after it completed its investigation).

Our review of the case law illustrates that whether to submit a delay-of-payment claim to a jury is a highly fact-sensitive analysis. To establish a claim for punitive damages in the context of a bad faith claim, James must establish three factors: 1) State Farm had a contractual obligation to her; 2) State Farm lacked an arguable or legitimate basis for its delay in paying her claim; and 3) State Farm's failure resulted "from an intentional wrong, insult, or abuse as well as from such gross negligence as constitutes an intentional tort."[5]   Jeffrey

---

[5] We acknowledge that James must demonstrate her entitlement to compensatory damages before she may receive punitive damages. *See Broussard v. State Farm Fire & Cas. Co.*, 523, F.3d 618, 628 (5th Cir. 2008) ("Mississippi law does not permit parties to recover punitive damages unless they first prove that they are entitled to compensatory damages." (citations omitted)). *See also* Miss. Code Ann. § 11-1-65(1)(b), (c) (West 2012); *Jordan*, 34 So. 3d at 1189 (describing process whereby after the jury awarded the claimant compensatory damages, the claimant moved to submit the issue of punitive damages to the jury). However, because the only question before us is whether summary judgment in favor of State Farm was proper on James's bad faith claim, we refrain from determining James's entitlement to compensatory damages.

Jackson, *Miss. Ins. Law and Prac.* § 13:2 (2012) (internal quotation marks and citations omitted); *see U.S. Fidelity & Guar. Co. v. Wigginton*, 964 F.2d 487, 492 (5th Cir. 1992); *see also Sobley v. S. Natural Gas Co.*, 210 F.3d 561, 564 (5th Cir. 2000). As a preliminary matter, the trial judge must decide, as a matter of law, that the insurer lacked "a reasonably arguable basis" for denying the claim. *See Broussard v. State Farm Fire and Cas. Co.*, 523 F.3d 618, 628 (5th Cir. 2008) (internal quotation marks and citation omitted) (quoting *Andrew Jackson Life Ins. Co. v. Williams*, 566 So. 2d 1172, 1186 n.13 (Miss. 1990)); *Wigginton*, 964 F.2d at 492 (citation omitted); *Fulton v. Miss. Farm Bureau Cas. Ins. Co.*, 105 So. 3d 284, 288 (Miss. 2012).

### 2. *Arguable or legitimate basis*

As noted above, whether an insurer possessed an arguable or legitimate reason is a question of law. *Wigginton*, 964 F.2d at 492 (citation omitted); *Jenkins v. Ohio Cas. Ins. Co.*, 794 So. 2d 228, 232-33 (Miss. 2001). "Arguable reason is defined as nothing more than an expression indicating the act or acts of the alleged tortfeasor do not rise to [the] heightened level of an independent tort." *Caldwell*, 686 So. 2d at 1096 (citation and internal quotation marks omitted). The initial burden placed on the insurer is low: it "need only show that it had reasonable justifications, either in fact or in law" for its actions. *Wigginton*, 964 F.2d at 492 (citation omitted). Once an insurance company articulates an arguable or legitimate reason for its payment delay, the insured bears the burden of demonstrating that the insurer had no arguable reason. *Caldwell*, 686 So. 2d at 1097. "The plaintiff's burden in this respect likewise exists at the summary judgment stage where the insurance company presents an adequate prima facie showing of a reasonably arguable basis for denial so as to preclude punitive damages." *Id.* at 1097 n.1 (citation omitted).

Whether a claimant has proven an insurer acted without a reasonable or arguable basis is determined by a preponderance of the evidence. *See, e.g., Miss.*

*Power & Light Co. v. Cook*, 832 So. 2d 474, 484 (Miss. 2002) (approving of jury instructions that used preponderance of the evidence standard); *Mut. Life Ins. Co. of N.Y. v. Estate of Wesson*, 517 So. 2d 521, 530 (Miss. 1987), *abrogated on other grounds by Gen. Am. Life Ins. Co. v. McCraw*, 963 So. 2d 1111, 1114 (Miss. 2007) (same).[6]

### 3. *Insurer duties under Mississippi law*

Mississippi places a duty on insurers to properly investigate the claims asserted by their insured. Specifically, "[u]nder Mississippi law, insurers have a duty 'to perform a prompt and adequate investigation and make a reasonable, good faith decision based on that investigation' . . . ." *Broussard*, 523 F.3d at 627-28 (quoting *Liberty Mut. Ins. Co. v. McKneely*, 862 So. 2d 530, 535 (Miss. 2003)). "A proper investigation means obtaining 'all medical information relevant to a policyholder's claim.'" *McLendon v. Wal-Mart Stores, Inc.*, 521 F. Supp. 2d 561, 565 (S.D. Miss. 2007) (quoting *Lewis v. Equity Nat'l Life Ins. Co.*, 637 So. 2d 183, 187 (Miss. 1994)). To do so, an insurer must "make a reasonable effort to secure all medical records relevant to the claim." *Stewart v. Gulf Guar. Life Ins. Co.*, 846 So. 2d 192, 204 (Miss. 2002) (citation and internal quotation marks omitted).

---

[6] State Farm argues that James must establish the lack of an arguable or legitimate basis by clear and convincing evidence. While it is clear that the second part of the punitive damages test under *State Farm Mut. Auto. Ins. Co. v. Grimes*, 722 So. 2d 637, 641 (Miss. 1998), does require clear and convincing evidence, *see* Miss. Code Ann. § 11-1-65, State Farm has identified no Mississippi court that has squarely addressed the question of whether establishing the lack of an arguable basis requires a similarly heightened standard. Moreover, the plain language of the Mississippi statute limits its heightened standard to proof of "actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or . . . actual fraud." Miss. Code Ann. § 11-1-65(1)(a). This plainly addresses the second part of the punitive damages test, not the threshold issue that we consider today. Therefore, as State Farm has presented no contrary authority, we hold that the lack of an arguable or legitimate basis requires only proof by a preponderance of the evidence.

No. 11-60458

## C. Analysis

Having set up the legal background to James's bad faith claim, we now proceed to determine whether State Farm has an arguable or legitimate basis for delaying payment on James's claim.[7] The parties have framed the analysis of this issue as an all-or-nothing proposition. State Farm delayed payment from February 2006, when James reported the accident to State Farm, until July 29, 2008, when State Farm tendered payment. James argues State Farm had no arguable or legitimate basis for the entirety of this thirty month delay. According to State Farm, it reasonably delayed payment during the entire thirty-month period because it "was actively investigating the claim and attempting to resolve the relevant issues," namely, the cause of James's injuries.

We agree that conducting a prompt and adequate investigation provides a legitimate basis for a payment delay. *See Caldwell*, 686 So. 2d at 1098. Therefore, to properly determine whether State Farm reasonably delayed payment, we need to analyze the record to understand when State Farm was actively investigating James's claim and thus had a legitimate basis for its payment delay. We look to the totality of the circumstances to determine whether State Farm had an arguable or legitimate basis for its delay. *See Hartford Underwriters Ins.*, 936 So. 2d at 896. In keeping with the practice of Mississippi courts, we analyze the entire investigation in discrete time periods to better assess the claims. *See Pilate*, 865 So. 2d at 395 ("We consider AmFed's investigation in several different time periods.").

---

[7] James also argues that State Farm withheld payment under one policy in order to coerce a lower settlement for claims under other policies. She concedes that she has no evidence to support this contention, and so she has waived this argument on appeal. *See* Fed. R. App. P. 28(a)(9)(A).

No. 11-60458

### 1. February-May 30, 2006 (~4 months)

State Farm argues it had a legitimate or arguable basis for delay from February through May 30, 2006 because it was attempting to determine whether Smith, the accident's tortfeasor, was insured. We agree that State Farm was conducting a prompt and adequate investigation during this time period.

James promptly notified State Farm of the accident in early February, and State Farm immediately began communicating with James about her collision and medical payments coverage. At the same time, State Farm was investigating whether Smith or the owner of the vehicle he was driving at the time of the accident had insurance coverage. If they had adequate insurance coverage, James's UM coverage would not apply. During this period of time, State Farm's claim representative attempted to reach Progressive, Smith's former insurance company, multiple times, and left numerous voicemail messages for a Progressive contact who never returned State Farm's calls. On May 30, 2006, State Farm confirmed that Progressive had denied coverage, triggering State Farm's UM coverage for accident-related injuries.

The record thus shows that State Farm had a legitimate basis for failing to tender payment from February through May 30, 2006 as it was actively investigating whether James was covered by her policy's UM benefits.

### 2. May 31, 2006-July 20, 2006 (~6 weeks)

State Farm argues its active investigation of James's claim provides a legitimate or arguable basis for its delay. We agree with this contention for the time period lasting from May 31 through July 20, 2006.

The record shows that State Farm received James's signed medical authorization form, authorizing State Farm to obtain James's medical records, on February 20, 2006. Thereafter, James continued to experience significant back pain for which she sought treatment. On May 8, 2006, she began seeing Dr. Ken Staggs at the Pain Treatment Center.

10

No. 11-60458

On June 5, 2006, State Farm requested James's medical records and bills from three medical facilities. James continued to apprise State Farm of her on-going medical treatment for which State Farm continued to promptly request medical records and bills. On June 21, 2006, State Farm received medical records from the Pain Treatment Center. The records stated that James had "compression fractures at T2, T3, T5, and T11 all ensuing from a motor vehicle accident presumed February 03, 2006 as there is edema on the MRI indicating that these are new." Soon after, Renee Powell, the State Farm claim representative recently assigned to James's file, noted that she had received the Pain Treatment Center records and reported that they diagnosed James as having "traumatic multi-thoracic compression fractures w/out retropulsion, T7-8 HNP w/o myelopathy or radiculopathy . . . ." Powell also observed the records listed past medical and surgical treatment James had received, and she specifically noted that the list did not include any spinal surgery. On July 18, 2006, Powell repeated her earlier entry about James's diagnosis and further stated that "[i]f records do not show any more evidence of pre-existing issues, it seems that the medical records are supporting that [James's] problems are a result of the [motor vehicle accident]."

On July 20, 2006, Powell noted in James's file, "Records from Wayne General indicate some degenerative changes in thoracic vertebrae with compression, but apparently the condition had not been causing any symptoms prior to loss, but I will review material closely as rec'd [sic]."

By requesting and reviewing James's medical records related to the accident, State Farm was engaged in an active investigation of James's bodily injury claim during this time period.

### 3. *July 20-October 4, 2006 (~11 weeks)*

State Farm argues its active investigation of James's claim provides an arguable or legitimate basis for its payment delay. Because State Farm was not

11

actively investigating James's claim during this time period, we hold that there is a question of fact as to whether James can satisfy her burden of demonstrating by a preponderance of the evidence that State Farm did not have an arguable reason for this eleven-week period of delay.

During this time period, James continued to receive medical treatment for her injuries, about which she continued to apprise State Farm.  On July 25, 2006, James reported to Powell that her doctors attributed her medical problems to the motor vehicle accident.  On July 30, 2006, State Farm received a bill from Staggs, which indicated that James was being treated for a thoracic compression fracture.

Although Powell's July 20 review of James's medical records recognized that James's symptoms might be due to a pre-existing injury that would not be eligible for coverage under James's UM motor vehicle coverage, State Farm did not act on this concern until October 5, 2006.  On that date, Powell sent James a letter asking her to call to discuss the claim and, in the subsequent phone call, she apprised James of her questions about whether the injuries were caused by a pre-existing injury.  The record does not show that Powell received any additional information bolstering her concern about a potential pre-existing injury during this time.  Between July 20, 2006 and October 5, 2006, Powell spoke to James at least twice, but Powell admitted in her deposition that she did not discuss her pre-existing condition concerns "in detail."  Nor does the record provide any evidence that Powell raised these concerns with James prior to October 5, 2006.

Because State Farm was not conducting any investigation during this time period, we conclude that it was not acting in accordance with its duty under Mississippi law "to perform a prompt and adequate investigation." *Broussard*, 523 F.3d at 627 (citation omitted).  State Farm has provided no explanation for its failure to inquire further into its concerns during this nearly three-month

period. Critically, State Farm does not point to any evidence in the record that Powell received any additional information during this time before she contacted James on October 5, 2006 to obtain prior medical records. It thus follows that Powell could have sought this information in July.

Accordingly, we hold that James has satisfied her burden of raising a fact issue regarding whether State Farm had an arguable or legitimate reason for this eleven-week delay between July 20 and October 4, 2006.

### *4. October 5, 2006–January 16, 2007 (~14 weeks)*

State Farm argues its active investigation of James's claim provides a legitimate or arguable basis for its delay. During this period of time, Powell acted on her concern that James's injury may have pre-dated the accident. On October 5, 2006, Powell sent James a letter asking her to call to discuss the claim. The letter stated, "If I can obtain some of your prior records, I may then be in a position to evaluate your uninsured motorist claim." On October 9, 2006, James disclosed to Powell that she had fallen on concrete over twenty years ago and had been treated for lower back pain at that time but had not been recently treated for any back problems. James also provided the names of all of her doctors to Powell.

On October 10, 2006, Powell sent James an authorization for release of prior medical records. On October 19, 2006, Powell wrote James a letter, reminding her to return the medical authorization that would allow the release of her prior medical records. On October 27, 2006, James left a message for Powell, stating that she would not sign the medical authorization. The same day, Powell sent James a letter acknowledging James's refusal. The letter noted in reference to some of the medical records State Farm had obtained, "As you can see, this does not clearly relate your ongoing treatment to an injury sustained in the accident and I am merely trying to determine if you had to treat for any of these pre-existing conditions prior to the accident [or] if they became

symptomatic following the loss. I do not know if I will be able to properly evaluate your claim without that information, but I am waiting on some information from Dr. Staggs at this time." On October 30, 2006, James called Powell to let her know that she would sign the medical authorization. James then executed the prior records release on November 1, 2006, and State Farm received it on November 6, 2006.

On October 27, 2006, State Farm sent a letter to Staggs, requesting all of James's medical records. The letter elaborated, "I am trying to determine if [the thoracic compression fracture for which Staggs was treating James] was caused by the accident of February 3, 2006, since the intial radiology report indicated that this injury was probably old. If your notes do not comment on what injuries were caused in this accident or how the accident may have affected any pre-existing injuries, please advise via letter." State Farm sent Staggs a second request for James's medical records on November 17, 2006. On January 16, 2007, Total Pain Care responded to State Farm's medical records request but advised that records prior to August 14, 2006 needed to be requested from a different facility. Powell did not contact Staggs again.

Seeking further clarification from the insured's treating physician as to the cause of the insured's injury is a legitimate basis for a delay of payment. Therefore, we conclude that State Farm's actions in attempting to resolve its questions via James's treating physician met State Farm's low burden to provide a legitimate justification for its delay during this time period.

### 5. *January 17, 2007-July 11, 2007* (~25 weeks)

State Farm asserts its active investigation of James's claim provides a legitimate or arguable basis for its delay. Because State Farm was not engaged in an active investigation between January 17, 2007 and July 12, 2007, we reject this argument. State Farm also presses that James's lawyer, Joe Clay Hamilton, failed to provide medical records, the delay of which should not be

attributed to State Farm.  Because the record contains no evidence that State Farm informed James's lawyer that it was concerned about the etiology of James's injuries, we decline to attribute the delay to James.  State Farm also argues that the delay is attributable to Staggs, whose medical records allegedly caused further confusion as to the cause of James's injuries.  We similarly reject this argument because Staggs sufficiently responded to State Farm's inquiry, and State Farm did not follow up with Staggs to seek further clarification.

On December 11, 2006, Hamilton notified State Farm that he was representing James and advised that he would forward James's medical bills and records when she had completed treatment.  The same day, Powell acknowledged Hamilton's representation and added, "Please forward all related medical and wage information you have concerning your client's injuries."  Over the next several months, Powell sent Hamilton several letters, requesting "material" for James.  Critically, it was not until July 12, 2007 that Powell notified Hamilton that she required prior medical records to fully assess James's claim.  State Farm argues on appeal that Staggs's January 16, 2007 medical records further confused its claim representatives, but the record does not disclose that Powell ever mentioned that confusion to Hamilton or the need for prior medical records until her July 12, 2007 letter.

While it is true that Powell sent several letters to Hamilton during this time period to which he did not respond, Powell's letters do not indicate any active investigation into State Farm's concern about the etiology of James's injury.  The record does not demonstrate that Powell ever communicated to Hamilton during this time period that she was concerned about the possible pre-existing nature of James's injuries, nor does the record show that Powell indicated to Hamilton that he should seek to gather *prior* medical records, not

just evidence of current treatment.[8]  Specifically, in her letter, Powell explained that "the initial [radiologist] reports indicated the compression fractures that Ms. James has are probably old.  . . . We will likely need some of her prior records to confirm her condition prior to loss as opposed to following the loss so you may want to request those as well."  There is no evidence in the record that Powell obtained these records after she became aware of Hamilton's representation.  To the contrary, there is ample evidence that, prior to January 17, 2006, she had these records and had noted the possibility that James's injuries pre-dated the accident.  Therefore, the record demonstrates no reason why Powell waited until July 2007 to inform Hamilton of her concerns and her need for prior medical records.

Under Mississippi law, a delay is not attributable to an insurer where the insured or his counsel refuses to cooperate or provide the necessary information.  *See Pilate*, 865 So. 2d at 397.  If an insured's lawyer advises the insurer to stop its investigation pending his sending medical records, the resulting delay until the lawyer sends the records is attributable to the insured.  However, as the burden is on the insurer to gather all necessary medical records, if the insurer fails to inform the lawyer of critical information necessary to further its investigation, the delay in obtaining that information is not attributable to the lawyer but to the insurer.  As State Farm did not inform Hamilton that it needed James's prior medical records to resolve questions about the causation of her injuries, State Farm is responsible for the resulting delay in investigating James's claim.

State Farm also argues that its delay should be attributed to Staggs because he did not provide clarification as to whether James's injuries were a

---

[8] Indeed, it was not until September 25, 2007 that Powell informed Hamilton that she required one year of prior records from all of James's physicians, whom she specifically named. James had disclosed the names of her physicians to Powell in October *2006*.

result of the motor vehicle accident. We disagree. We do not express an opinion as to whether Staggs's medical records actually were confusing. Instead, we observe that after Powell received Staggs's medical records in January 2007, she never contacted Staggs to seek further clarification nor did she notify Hamilton of her confusion. Moreover, the delay is not attributable to Staggs because, as James argues, he reasonably could have believed that he had complied with Powell's request to provide further information. If Staggs believed his records were clear, he needed to provide no further information. That they were unclear to Powell, who did not seek further clarification, is not Staggs's fault and thus is not chargeable to James. *See Stewart*, 846 So. 2d at 204 (citation omitted).

Accordingly, we conclude that James has met her burden by raising a fact issue as to whether State Farm had a legitimate or arguable basis for delaying its payment during this time period.

### 6.  *July 12, 2007-March 28, 2008 (~8 months)*

We agree that State Farm had a legitimate reason for the eight-month period of delay between July 12, 2007 and March 28, 2008 because State Farm was actively attempting to resolve causation issues related to James's injuries.

As discussed above, on July 12, 2007, Powell informed Hamilton that the medical records presented conflicting information about the age of James's injuries and advised him that "[w]e will likely need some of [James's] prior records to confirm her condition prior to the loss as opposed to following the loss so you may want to request those as well." Powell also talked to Hamilton multiple times in August, and he assured her that he would obtain clarification from Staggs. Once Powell received the medical records from Hamilton, Powell conducted a prompt review and then sought a second opinion from another State Farm employee, who also pointed out the conflicting information about the

17

etiology of the injuries.[9]   On September 25, 2007, Powell requested that Hamilton provide one year of prior records from all of James's doctors.  On March 28, 2008, State Farm received, from Hamilton, Staggs's clarification about his medical records.

Therefore, based on the evidence in the record, we conclude that State Farm was engaged in an active investigation of the cause of James's medical condition.  As this justifies a payment delay, we conclude that State Farm had a legitimate reason for its delay during this time period.  *See Caldwell*, 686 So. 2d at 1098.

### 7. *March 29, 2008-July 29, 2008 (~4 months)*

State Farm argues that it paid James's UM claims "in an attempt to resolve and streamline issues of dispute in this case."  The record contains little evidence of State Farm's investigative actions during this time period because State Farm's claims file terminates on September 27, 2007.

The evidence in the record shows that James filed suit against State Farm on October 23, 2007.  On March 28, 2008, State Farm received Staggs's clarification about his medical records, although State Farm claims this clarification only served to create further confusion.  There is no evidence in the record that State Farm received any additional information about James's medical claims between March 28, 2008 and July 29, 2008, when State Farm paid James's claims in full.[10]

---

[9] James contends that this review was improper because the Injury Claim Trainer who evaluated the records was not a medical doctor.  However, James has provided no authority to support her claim, so she has waived this argument.  *See* Fed R. App. P. 28(a)(9)(A) ("The appellant's brief must contain . . . citations to the authorities . . . ."); *see also Procter & Gamble Co. v. Amway Corp.*, 376 F.3d 496, 499 n.1 (5th Cir. 2004) (collecting citations) ("Failure adequately to brief an issue on appeal constitutes waiver of that argument.").

[10] For example, Staggs was not deposed until January 2009.

No. 11-60458

"[A]n insured's filing of a suit on the claim does not suspend the insurer's obligation to promptly pay claims that are admittedly owed." Jeffrey Jackson, *Miss. Ins. Law & Pract.* § 10.2 (2012). There is no evidence in the record that State Farm received any additional information from James after March 28, 2008, yet State Farm waited an additional four months before it tendered payment. State Farm has not advanced an explanation for this delay nor presented any evidence of additional investigative actions it undertook during this time period, even though it has had ample opportunity to do so over the course of this lengthy litigation. Therefore, we hold that James has met her burden by raising a fact issue regarding whether State Farm had a legitimate or arguable basis for delaying its payment during this time period.

In summary, this case falls far short of any standard of prompt handling by either side. Compounding this delay is that State Farm's summary judgment motion lay dormant in the district court for over two years. It is inexplicable that an accident that occurred in February 2006 has not moved past the preliminary stages of litigation by the Spring of 2013. All parties will be best served by the expeditious resolution of this case.

After our careful review of the lengthy summary judgment record, we hold that there is a question of fact as to whether State Farm had an arguable or legitimate basis for its delay. Because James has raised fact issues on her bad faith claim, she is entitled to present her claim to a finder of fact upon remand.[11] Under Mississippi law punitive damages are only warranted if State Farm acted

---

[11] The dissent asserts that the record shows "at most [] mere negligence" on the part of State Farm and that negligence alone is insufficient to support a trial on compensatory damages. *Post*, at 4. Neither party asserted that State Farm's delay was due to negligence. Therefore, we have not considered this issue, nor do we express an opinion on it. Our opinion holds that James has raised an issue of fact regarding whether State Farm has an arguable or legitimate basis for some of its payment delay. When James presents her claim to a fact finder, our opinion does not preclude State Farm from arguing that its delay was attributable to mere negligence. It is for the fact finder to determine whether James is entitled to punitive damages—and if so, in what amount—given State Farm's delays.

19

with "actual malice, gross negligence, which evinces a willful, wanton or reckless disregard for the safety of others, or committed actual fraud." *See* Miss. Code Ann. § 11-1-65(1)(a). In light of our holding that there is some evidence that State Farm lacked an arguable or legitimate basis for delay we remand for the district court to consider in the first instance whether this delay was negligent or the result of "actual malice, gross, negligence, which evinces a wilful, wanton or reckless disregard for the safety of others, or committed actual fraud." *See id.*

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's grant of summary judgment as to any breach of contract claim independent of the bad faith claim. We hold that there is a fact issue as to whether, under the totality of the circumstances, State Farm had an arguable or legitimate basis for its delay. Therefore, we REVERSE the district court's grant of summary judgment as to James's bad faith claim and REMAND for further proceedings consistent with this opinion. Given the length of time that has elapsed since James filed suit, we ORDER the district court to proceed expeditiously.

No. 11-60458

EMILIO M. GARZA, Circuit Judge, concurring in part[1] and dissenting in part:

Because the majority opinion misapplies Mississippi law and omits significant facts of this case, I am compelled to dissent.

The majority's fundamental error lies in its failure to recognize, much less address, the central issue in this case: James had to establish as a material issue of fact that State Farm acted with actual malice or gross negligence in delaying payment. *Caldwell v. Alfa Ins. Co.*, 686 So. 2d 1092, 1095–96 (Miss. 1996). Stated differently, the majority incorrectly holds that simple negligence is sufficient to support James's bad faith claim. *Windmon v. Marshall*, 926 So. 2d 867, 873 (Miss. 2006). Similarly, the majority errs in holding that James raised a genuine issue of fact as to whether State Farm had an arguable or legitimate basis for the delay—the record clearly reflects that State Farm was investigating the true cause of James's injury before making payment. Finally, the majority's use of arbitrary time periods is concerning and may create significant confusion about insurers' legal obligations to investigate claims and administer payments.

## I

This is an appeal from a grant of summary judgment on James's claim that State Farm acted in bad faith when it delayed payment of her uninsured motorist claim. James sought punitive damages based on this alleged independent tort under Mississippi law. After discovery, State Farm moved for summary judgment, and James opposed the motion, seeking to have the case proceed to trial.[2]

Summary judgment is appropriate when the movant shows that there is "no genuine dispute as to any material fact and the movant is entitled to

---

[1] I agree with the majority that we should affirm the district court to the extent that it granted summary judgment on James's breach of contract claim.

[2] James did not cross-move for summary judgment.

21

judgment as a matter of law." FED. R. CIV. P. 56(a). To do this, the movant may "demonstrate that the evidence in the record insufficiently supports an essential element of the opponent's claim . . . ." *Duplantis v. Shell Offshore, Inc.*, 948 F.2d 187, 190 (5th Cir. 1991) (citation omitted). Nonetheless, the non-movant can respond by producing "evidence sufficient to sustain a finding in [its] favor" on an issue for which the non-movant would bear the burden of proof at trial. *Kovacic v. Villarreal*, 628 F.3d 209, 212 (5th Cir. 2010) (citations and quotations omitted).[3]

To win on a bad faith claim and recover punitive damages under Mississippi law, the plaintiff must establish "that the defendant . . . acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud." Miss. Code. Ann. § 11-1-65(1)(a). Additionally, the plaintiff must show that the insurer had no arguable or legitimate reason for denying or delaying payment on the claim. *Caldwell*, 686 So. 2d at 1096. An arguable reason is "nothing more than an expression indicating the act or acts of the alleged tortfeasor do not rise to [the] *heightened level of an independent tort*." *Id.* (quoting *Universal Life Ins. Co. v. Veasley*, 610 So. 2d 290, 293 (Miss. 1992)) (emphasis added). Where the record

---

[3] The majority muddles basic summary judgment procedure. The opinion states: "Because State Farm was not actively investigating James's claim during this time period, we hold that there is a question of fact as to whether James can satisfy her burden of demonstrating by a preponderance of the evidence that State Farm did not have an arguable reason for this eleven-week period of delay." *Ante*, at 11. To defeat summary judgment, James's burden is simply to demonstrate that there is a genuine dispute of fact about whether State Farm had an arguable or legitimate basis for the delay. Next, the majority explains that "[b]ecause State Farm was not conducting any investigation during this time period, we conclude that it was not acting in accordance with its duty under Mississippi law 'to perform a prompt and adequate investigation.'" *Ante*, at 12 (citation omitted). While the next paragraph returns to the summary judgment posture, this language reads as a conclusion of law—not a determination that James has raised a fact issue about whether State Farm was acting in accord with its duty.

No. 11-60458

at most demonstrates "mere negligence," an insurer's actions do not rise to the level of an independent tort. *Windmon*, 926 So. 2d at 873.

Based on the governing law and the record evidence, the district court determined that James could not establish that State Farm acted with actual malice or gross negligence. It also found that State Farm had an arguable or legitimate reason for delaying payment—namely, its ongoing investigation into the cause of James's injuries. *See Faith James v. State Farm Mut. Auto. Ins. Co.*, No. 4:07-cv-137, 2011 WL 1743421, at *9 (S.D. Miss. May 6, 2011) [hereinafter District Court Opinion]. As a result, the court held that James could not prevail on her bad faith claim and, accordingly, that State Farm was entitled to summary judgment. *Id.* at *9–10.[4]

## II

The majority reverses without even considering whether James can show that State Farm acted with "actual malice" or "gross negligence." *See* Miss. Code. Ann. § 11-1-65(1)(a).[5] Today's holding addresses only the existence of a

---

[4] Like the district court, *both* James and State Farm recognize that a bad faith claim requires proof of actual malice or gross negligence under Mississippi law. *See, e.g.*, Appellant Br. at 18 ("[A] plaintiff must show that the insurer lacked an arguable or legitimate basis for denying a claim, or that the insurer committed a willful or malicious wrong, or acted with gross and reckless disregard for the insured's rights.") (internal citations and quotations omitted); Appellee Br. at 26 ("[T]here is no evidence or charge herein that State Farm has acted with actual malice in this case.").

[5] Today's opinion explicitly severs the question of whether State Farm acted with actual malice from that of whether State Farm had an arguable or legitimate basis for its delay. *See ante,* at 8 n.6 (addressing only the "threshold issue" of State Farm's arguable or legitimate reason for delay). The majority refuses to "express an opinion" about whether the record demonstrates more than ordinary negligence, that is, whether the record shows the conduct necessary for bad faith. *See ante*, at 19 n.11. Mississippi courts, however, consider both aspects at the same time. *See Windmon*, 926 So. 2d at 872.

No. 11-60458

legitimate or arguable reason for the delay in payment. *Ante*, at 19.[6] But, the record does not show that State Farm acted with malice or gross negligence. During the delay period, because the etiology of James's injury was legitimately in doubt, State Farm made numerous attempts to obtain medical records from James, her doctors, and her attorney. It was not until the necessary records were produced that State Farm could complete its investigation and make a final determination on James's claim. Even under the assumption that State Farm's investigation lacked diligence during three periods of time, *see infra* Part III, the record at most demonstrates "mere negligence," which is insufficient to support a bad faith claim. *Windmon*, 926 So. 2d at 873; *see also Caldwell*, 686 So. 2d at 1099. Thus, the district court properly granted summary judgment because the facts did not present a genuine issue about "whether State Farm lacked a legitimate or arguable reason for the delay *and* [whether] such delay amounted to a willful or malicious wrong." District Court Opinion, at *9 (emphasis added).

In an attempt to justify this departure from Mississippi law, the majority claims that "[n]either party asserted that State Farm's delay was due to negligence." *Ante*, at 19 n.11. This statement is misleading, as simple negligence is not at issue in this case. Rather, the question is whether the record can support a finding that the delay reflected malice or gross negligence

---

[6] The only definitive pronouncement from today's opinion is the majority's specific holding that "there is some evidence that State Farm lacked an arguable or legitimate basis for delay." *Ante*, at 19. While the opinion opines that James is "entitled to present her claim to a finder of fact on remand," *id.*, and suggests that she will do so, *id.* at 19 n.11, nothing in the majority opinion necessarily commands that the case proceed to trial. The district court retains its discretion to hear additional motions in its management of the case. Should the court continue to find that there is insufficient record evidence that State Farm's conduct rises to the level of an independent tort, it may grant summary judgment on this basis. Or, should the case reach a jury, the district court retains power under Rule 50.

24

No. 11-60458

amounting to bad faith; State Farm contends that it cannot. Thus, the issue of bad faith is squarely before us on appeal, as it was before the district court. Even if State Farm did not raise this issue, summary judgment requires a court to determine whether the moving party is entitled to judgment as a matter of law[7]—we *must* decide whether the record could show that State Farm committed an independent tort.[8]

Accordingly, I would affirm the district court's grant of summary judgment on James's bad faith claim.[9]

### III

I further disagree with the majority's holding that James raised a fact issue concerning whether State Farm had an arguable or legitimate basis for delaying payment. *Ante,* at 19.

---

[7] *See* 10A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2725 (3d ed. 2013) ("Once it is determined that there is no genuine issue as to any material fact and that a party is entitled to the benefit of a judgment as a matter of law, judgment should be entered even though the legal principles relied upon by the court may differ from those that have been urged upon it by the litigants.").

[8] On remand, the majority has tasked the district court with considering "in the first instance whether this delay was negligent or the result of 'actual malice . . . .'" *Ante*, at 19. However, the district court has *already* done this. In its summary judgment order the court stated that it "cannot conclude that State Farm's conduct rose to the level of gross negligence or an independent, intentional tort." *See* District Court Opinion, at *9. Considering whether the record shows malice or gross negligence is this court's task on de novo review of the district court's order. The majority errs in refusing this responsibility.

[9] Separately, as the majority correctly notes, "Mississippi law does not permit parties to recover punitive damages unless they first prove that they are entitled to compensatory damages." *Ante*, at 6 n.5 (quoting *Broussard v. State Farm Fire & Cas. Co.*, 523 F.3d 618, 628 (5th Cir. 2008)). Thus, to prevail on remand James must demonstrate that she suffered some compensable damage because of the delay. Given that State Farm ultimately paid James's claim, it is not clear what damages she can demonstrate, and the majority fails to provide any meaningful guidance. This is an open issue for the district court on remand.

No. 11-60458

## A.  July 20, 2006 – October 4, 2006[10]

The majority holds that James raised a fact issue regarding whether State Farm had a legitimate basis for delay from July 20, 2006 until October 4, 2006 because, despite State Farm's determination that James's symptoms might be due to pre-existing injuries, State Farm did not "act on this concern" until October 5, 2006, when Powell wrote to James asking her to call to discuss her claim.  *Ante*, at 12.

I disagree.  State Farm's activity log indicates that Powell made multiple attempts to reach James during this period, and that Powell and James had at least three conversations.  R. USCA5 1081–82.  On July 18, 2006, just two days prior to the start of this period, Powell sent medical record requests to six different facilities.  R. USCA5 1083.  When Powell noted on July 20, 2006, that the medical records from Wayne General indicated degenerative changes, State Farm could not yet make a conclusive determination about James's symptoms because other record requests were still outstanding.  R. USCA5 1077, 1083.  Moreover, during the next several weeks, Powell continued to contact healthcare providers, gather medical records, and pay invoices for records.  R. USCA5 1080–82.  In light of the record evidence, James cannot show that there is a genuine dispute about State Farm's legitimate basis for delay during this period.

## B.  January 17, 2007 – July 11, 2007

The majority holds that James raised a fact issue as to whether State Farm had a legitimate basis for delay from January 17, 2007 through July 11,

---

[10]  While I would not use arbitrary time periods to analyze the summary judgment record for the reasons set forth in Part IV, *infra*, I use the majority's own framework to address their errors.

No. 11-60458

2007, because even though State Farm did not yet have the requisite medical records to evaluate James's claim, the insurer did not specifically communicate "the need for prior medical records" to James or her attorney, Hamilton. *Ante*, at 15. The majority explains, "[b]ecause the record contains no evidence that State Farm informed James's lawyer that it was concerned about the etiology of James's injuries, we decline to attribute the delay to James." *Ante*, at 14.

Again, the majority misreads the record. First, the majority overlooks the fact that State Farm had previously informed James of the need for the medical documents and the reasons for the request. State Farm requested James's medical records from (1) James on October 5, 2006 and October 27, 2006 (2) James's doctor, Dr. Staggs, on October 27, 2006 and November 17, 2006 and (3) Hamilton on December 11, 2006, May 3, 2007, and June 13, 2007. R. USCA5 1060, 1292, 1297, 1302, Exh. 63–27, 63–28, 63–30 (sealed).[11] Thus, inaction on

---

[11] Letters from Powell to James and Dr. Staggs clearly state the need for prior medical records in order to fully assess James's claim and determine the etiology of James's injury. An October 5, 2006 letter to James stated: "If I can obtain some of your prior records, I may then be in a position to evaluate your uninsured motorist claim." R. USCA5 1060. The follow-up letter on October 27, 2006 was even more specific: "I am merely trying to determine if you had to treat for any of these pre-existing conditions prior to the accident or if they became symptomatic following the loss. I do not know if I will be able to properly evaluate your claim without that information, but I am waiting on some information from Dr. Staggs at this time." R. USCA5 1297. A letter to Dr. Staggs, sent first on October 27, 2006 and again on November 17, 2006 explained: "I am trying to determine if this was caused by the accident of February 3, 2006, since the initial radiology report indicated that this injury was probably old. If your notes do not comment on what injuries were caused in this accident or how the accident may have affected any pre-existing injuries, please advise via letter." R. USCA5 1292, 1302. Hamilton's December 7, 2006 letter stated he would "forward to [State Farm] copies of all medical bills and medical records when [his] clients have completed treatment." R. Exh. 63–26 (sealed). Powell acknowledged receipt of Hamilton's letter. And, in accordance with the practices Powell and Hamilton had established over their 30 years of prior dealings, as well as Hamilton's December 7, 2006 letter, Powell waited for Hamilton to send a medical records package. Powell Dep., R. Exh. 63–7 at 53 (sealed). In State Farm's activity log, Powell noted

27

No. 11-60458

State Farm's part did not cause the delay.  Moreover, State Farm needed time to resolve a conflict between, on the one hand, Dr. Staggs's report indicating that the injuries were new, and on the other hand, notes from an office visit, radiology reports, and James's own report indicating that the fractures were pre-existing.  This conflict was not resolved—if at all—until March 28, 2008 when Dr. Staggs clarified by fax that his opinion was that James's injuries were new.[12] R. USCA5 1305.  Thus, on this record, James cannot show a genuine dispute about State Farm's legitimate basis for delaying payment during this period.

## C.  March 29, 2008 – July 29, 2008

The majority holds that James met her burden to raise a fact issue regarding whether State Farm had an arguable basis for delaying payment from March 29, 2008, the day after State Farm received the clarifying fax from Dr. Staggs, until July 29, 2008, when State Farm actually tendered payment on James's uninsured motorist claim.  *Ante*, at 18–19.

Although Dr. Staggs's fax clarified his opinion on James's injuries, the fax conflicted with radiology reports,[13] and State Farm never received some of

---

again on January 22, 2007 that Hamilton would send all material when he had it.  R. USCA5 1077.  Powell followed up with Hamilton on May 3, 2007 and June 13, 2007, reminding him to forward James's medical records when they became available, but Hamilton did not respond.  R. Exh. 63–28, 63–30 (sealed), 1076.

[12] Dr. Staggs's clarifying fax consisted only of the words, "According to my 7/6/06 notes those fractures were recent at that time."  R. USCA5 1305.

[13] In his deposition, Dr. Staggs stated that (1) the radiology reports were inconsistent with his finding that the injuries were new,(2) the CT scan showed evidence of a preexisting injury, and (3) there were inconsistencies in James's medical records as to the origin of her injury.  R. USCA5 1179–80.

No. 11-60458

James's prior medical information, initially requested in October 2006.[14]  Even assuming Dr. Staggs's fax provided sufficient information to clarify the inconsistences, State Farm needed at least some reasonable amount of time to review the new information contained in the fax.  The bad faith clock does not begin to tick "as soon as there is any information available that could subsequently be considered as sufficient evidence to support the payment of [the claim]."  *Pilate v. Am. Federated Ins. Co.*, 865 So. 2d 387, 399 (Miss. Ct. App. 2004) (holding that payment five months after receiving medical records sufficient to make disability determination was not bad faith); *see also Caldwell*, 686 So. 2d at 1098 (affirming a grant of summary judgment to insurer on a bad faith claim even though payment came six weeks after completing investigation).  As the district court correctly observed, and the majority does not appreciate, "[t]he standard is not whether State Farm could have investigated the claim in a way that might have resulted in prompter payment of benefits; instead, the standard is whether State Farm lacked a legitimate or arguable reason for the delay . . . ."  District Court Opinion, at *9.  Again, James cannot establish a genuine dispute about State Farm's legitimate basis for delaying payment.

## IV

The majority's use of arbitrary time periods for its bad faith analysis is concerning.  This approach brings judicial scrutiny to the level of an insurer's daily activities and may cause significant uncertainty about insurers' claims investigation obligations under the law.

---

[14] Powell logged a package of medical records as received from Hamilton on August 31, 2007.  R. USCA5 1073.  Powell wrote to Hamilton on September 25, 2007, requesting prior medical records from Dr. Byrd, Dr. Green, and Dr. Daggett, but Hamilton never responded to this request.  R. Exh. 63–36 (sealed).

No. 11-60458

The majority's approach, as I understand it, uses time periods only to facilitate its analysis of the record. *See ante,* at 9 ("We analyze the entire investigation in discrete time periods to better assess the claims."). While the majority finds that James established a fact issue during three of the discrete time periods it created, its ultimate holding is based on "the totality of the circumstances." *See id.* Moreover, because the date ranges are only the majority's analytical tools, they do not bind the district court on remand.

While a periodized approach might be a useful tool for analyzing a lengthy factual record, the majority's drawing legally significant conclusions about each of the periods it created is troubling. First, even James herself did not use this periodized approach in her briefs before this court or the district court. Second, it is not clear that the majority's approach reflects the actual practice of Mississippi courts.[15] Third, the majority's analysis leads to arbitrary conclusions about inactivity: In Part II.C.3, the majority starts one analytical period (July 20, 2006 – October 4, 2006) immediately after Powell sent letters, clearly part of an active investigation, on July 18, 2006. In short, a periodized approach has the strong potential to blind a reviewing court to the factual forest by focusing on isolated trees. Because this approach is not the clear practice of the Mississippi courts and muddles the legal standards for insurance claims investigation, I would have evaluated State Farm's actions throughout the course of its investigation without creating discrete time periods.

---

[15] The majority cites only one decision in support of this practice, and it is from a court of appeals, not the Supreme Court. *See Pilate v. Am. Federated Ins. Co.*, 865 So. 2d 387 (Miss. Ct. App. 2004). A search of published Mississippi cases did not show others applying such a segmented approach, and it certainly did not reveal a trend among the courts. The district court's more holistic approach of evaluating whether State Farm's actions throughout the course of the investigation constituted bad faith seems more in line with precedent.

No. 11-60458

The majority's arbitrary periodization further suggests that an insurer must take constant, visible actions to protect itself against allegations of bad-faith delays, whether or not those actions are meaningful. Otherwise, a reviewing court might simply choose to begin an analytical period on a day when its claims investigator turned his or her attention to another matter. The majority's analysis thus has the potential to wreak havoc on insurers' claims processing and raise the cost of coverage, all in the name of requiring insurers to avoid even a superficial appearance of bad faith.

## V

Respectfully, I remain in dissent.